Good morning all. Our first case this morning is Timm v. Goodyear Dunlop Tires, Mr. DeRose. Mr. DeRose, we'll have this lowered for you. Good morning, Your Honors. I'm the attorney for Donald and Mary Timm. We had a motorcycle accident back in 2013. I appreciate that just recently the court has told us this is a more nuanced inquiry. It's because after his Honor dismissed the qualifications of my experts, some re-judgment followed. So I know I have an uphill battle. And I guess what I want to suggest is the experts that I have put forward in this particular case have been received by the federal courts for years. And I've had reported cases, which I shared with the court, where other district court judges have said Professor Worley has vast experience in both tire manufacture, tire analysis, and tire failure analysis. And I was kind of surprised when he was found to be unqualified for this. He told his Honor that yes, my theory here, I know of no one else that holds it, but I have done four cases with this very problem with the D402 tire. And in all four cases, with Tim being the fourth of them, I have done two additional testings on them. And I know that there is a defect because Goodyear Dunlop would let the tires go through a manufacturer and they would have a defect, which would lead to a failure to properly seat the tire on a rim. With respect to Professor Worley's theory, it makes so much sense, especially when we look at the rim that was left after this accident that Mr. Tim has. You will see on one quarter of the rim, there is tremendous scraping and gouging. That's where the rim came in contact with the pavement after the tire became unseated after the de-beating took place. So that Mrs. Tim tells, she didn't know what happened, but all of a sudden, they're going down the road at normal speed, and all of a sudden, the motorcycle starts hopping, skipping and hopping. And the reason for that is, part of the tire actually comes out from the place where it's supposed to seat. They call it a hump on the rim that puts the tire back inside of it. Now, on an automobile car and a light truck, they have a requirement. The tire or a blowout, it is required, but they don't have that with respect to motorcycle tires. And one would expect that it would be because if a car tire unbeads, you're still going to be remaining upright because you've got four contacts with the ground. But with a motorcycle, it's not so. Your ability to maintain your balance is very hard. Professor Worley and Dr. Lee said it's impossible. Dr. Lee, of course, he has the big program at Michigan State University where he teaches all this. The qualifications of these gentlemen are great. Mr. DeRose, I didn't read Judge Simon, and you can correct me if I just misread it. I read his opinion a little bit differently than that. I read him to say, especially with respect to Professor Worley, that the methodology that was underlying his opinions just lacked the reliability that the Daubert framework requires. Do you disagree with that? No, Your Honor, I do not. But what I'm suggesting, Judge, is he misses Professor Worley's important opinions in this. He said, I don't care if no one holds that. If the tire cannot maintain its beading and seating on the rim, there's no way a motorcycle is not going to be a motorcycle. You're right, Judge Simon says. Well, who else holds this opinion? He said, I don't know of anyone else who holds the opinion. But that's my opinion, and I've been doing this for many, many years. Judge, all manufacturers of motorcycle tires have known for years you cannot have unseating of a tire. That's known. Harley Davidson, they test by using a riderless motorcycle being towed when they cause it, because they don't want to run the risk that an operator of a motorcycle will actually be in that circumstance, because you cannot control a motorcycle. So I agree with what Your Honor's assessment is, but I don't know that I was very good at persuading His Honor that what Professor Worley is saying has been well known for years, and his methodology was actually tested. He's done it now in four cases. All four cases involved the D402, which is a tire that has been discontinued now. Compared to what Harley Davidson sells now, it's a much narrower tire doesn't even look like what is available today. But Harley Davidson had their name on the tire, and the people who are the hog fans, they live and die by the hog brand or the Harley Davidson brand. You won't find another manufacturer of motor vehicles who has his name on the side of between Goodyear Dunlop. The tire has been completely discontinued. In my original complaint, when I looked on the internet, I found 10 different lawsuits of experienced motorcyclists who suddenly lost control of their motorcycle and couldn't figure out why. Professor Worley or excuse me, Professor Worley has opined on this in many of those cases and has been successful. The D402 should have been taken off the road a long time ago, but this is a defect in the tire. So I don't run out of my time. I also want to address the helmets because that's originally how I got into this case. Mr. Tim was airlifted by helicopter after the accident to Creighton Hospital. He spent many days there with very serious brain injuries. He came back to Chicago and was at the Rehabilitation Institute in Chicago. While he was there, they get a notice that the motorcycle helmet had been recalled. They knew nothing about this. The notice says, don't wear this helmet because it can enhance your injuries and suffering. So they come to see me about the helmet. I look at that and then I go on the internet. While I'm looking at helmets, I start seeing all that business about the D402 tire. That's how I ultimately put the whole case together on both of those theories. Now that helmet was originally called, by the way, they were made in China and were brought over by Mr. Budazaz and Aaron Gulshan. Two different gentlemen who are related. Mr. Gulshan's name, or Gulshani, he's no longer a defendant as of proceedings, but they are family members. Gulshani lives in California and Budazaz lives over in Nevada, where they gamble. I forget where they gamble anymore, but you know where I'm talking about. In any event, these gentlemen use the company names interchangeably. Budazaz says helmet ventures where Mr. Kim bought his second helmet. He said, well, I either gave it to my don't know. But when you go on the internet, which is how they, I forgot what I was saying. But when you go on the internet and if you look, because you want to buy something from one of the companies called Leather Up, you might get something that has been moved over to a motorcycle half helmet. These companies are interchangeable. They work out of the same places. The National Highway Traffic Safety Association even says in their notices, what's going on here? We've got so many different names for these particular helmets. But in 2012, they're told, get them off the road. Those helmets don't work. They don't do anything about that. That notice in 2012 should have come to Mr. and Mrs. Kim. They never got it. In 2013, NASA goes again and the same helmets a year later, and they find they still can't pass tests. So they contacted them. Why didn't you get those off the road? How many? Oh, there were more than we thought. Well, now they say you will get them off the road. You've got to get all those helmets off the road. Mr. DeRose, is that failure to do so, in your view, the evidentiary basis for the defect? Yes. All of that testing. The testing by the National Highway Traffic Safety Association says they failed all those penetration tests. They had four different tests. Right. So you have NHTSA does the recall. There's no question about that. Are you aware, though, of whether we or another court has held that the recall itself is sufficient proof of the product defect without more? No, but I know me as an individual, if I get a letter that tells me your product, don't wear it, it won't protect you, and it might enhance any personal interest. I'm going to throw it out now. That's only me as a consumer. I honestly don't have an answer to your Honor's inquiry. Judge, those helmets were brought in here from China. The National Association told them that because you imported them, you're just as responsible for them being in America as would be the manufacturer. I don't know. I guess I still got some time. Judge, if you have some questions for me, I'll be happy to answer them. I'm not so good at just putting it all out there. I guess not. We'll reserve the rest of your time for rebuttal. That's good. I might need it. I've got a lot of opposition here. Thank you, Mr. DeRose. Mr. Bott. Please record. My name is Ed Bott. It's my privilege to represent Goodyear Dunlop Tires, North America. Because the Daubert analysis is a case-specific analysis, I'd like to spend a few minutes. The model is an MU85B16 tire that was manufactured by Goodyear Dunlop Tires, North America and its Buffalo plant in the 23rd week of 2012. It was designed and manufactured for certain touring motorcycles of Harley-Davidson of the model year 2003 through 2007. The rim on which it was mounted was one chosen by Harley-Davidson and is an approved rim by the the completed application of this tire with this rim is an acceptable application by the Tire and Rim Association. Flash is something that comes about in the manufacturing process of the tire. The tire is put together, the components of the tire are put together, and at the end of that process it goes to what's called the curing phase. In the curing phase, the tire is subjected to heat and pressure, and in that process takes the form of the tires as we see them and use them in our day-to-day activities. As it's cured, it's put in a two-piece mold and at the junction of the mold, which is right above the bead fit area, is a slight opening. As the rubber is subjected to the heat and pressure, there's an opportunity for a small piece of rubber to form in that area between the mold. We had provided to Judge Simon at the court below a little piece of Flash which was filed with Document 338 in this record, and this is another representative sample of what that is. It's a very small, thin, light residue of rubber that's trimmed off at the final finish inspection. Is it always that thin? Yes. Always? Yes. Bead unseating has to occur because you have to have an opportunity to change tires when they need to be replaced. Tires are mounted on the rims through use of specialized equipment where they're pulled over the bead seat area and then pressurized to push the tire against the rim flange. In order to change out that tire, you have to release all inflation pressure and then, with machinery again, apply significant force to the sidewall of that tire to push it over the bead. When tires lose their air, they are subject to bead unseating. Motorcycle tires traveling down the interstate with loss of inflation pressure, as we have in this case because of a puncture, they're subject to bead unseating. And simply because a bead unseats, because of the lateral forces, the natural forces of the roadway and the motion of the motorcycle against that roadway, that does not mean it's defective. In fact, Mr. Worley has testified in the Clucci case, which is part of the record, that if in fact a tire loses air pressure and it's going down the rim, we have an issue as to when did the unseating occur. Mr. DeRose commented that there are these gouges on the rim, which he uses to support his theory it unseated as it was upright traveling straight down the highway. Those gouges are on only a third of the rim. Mr. Worley has admitted that the gouges are actually lateral gouges, and we submit that those gouges support the defense theory that it happened as the motorcycle was going down, subjected to the lateral forces of the pavement, which then allowed just that one-third of the rim to hit the pavement and caused the lateral gouges. Had it happened as the motorcycle was upright going straight, you would have had it circumferentially around the entire rim as opposed to only on one-third of it. So then we turn to the issue then is Mr. Worley needs to overcome the accepted science in the industry that this can happen absent a defect, and he needs to establish reliable scientific basis for his opinion that this small amount of flash is what caused this tire to unseat. As you look at the record in the court below, you have Judge Simon who faithfully applied all of the Daubert factors and issued a very well-reasoned decision as to why he felt Mr. Worley's opinions on that issue were not reliable. He pointed out that Mr. Worley did not measure the flash and cannot say how much outside of tolerance this flash was. And I should clarify that point a little bit. There is within Goodyear-Dunlop's manufacturing standards, a tolerance of a certain amount of flash that is acceptable. It is to be trimmed off because in Goodyear-Dunlop's perspective, this is cosmetic, and it does impact the quality standards that we have for sending our tires as original equipment to Harley-Davidson. It is the appearance of those tires that is important to us so that when Harley-Davidson receives them, they get a quality finish appearing product. I'm glad you're right. This is what I can say. You can set the facts here aside for a second. Is there a certain level though at which the flash would become so excessive, too much extra flash that you could run into concerns about safety? Or in other words, is it purely cosmetic regardless of how much extra flash there is? A huge amount of rubber around the sidewall, that could present some type of factor in terms of the bead fitment. But in these particular cases, it's trimmed off. And it's trimmed off to the point where really just a very fine, thin, we're talking about 0.006. That's what you said. It's never any thicker than that. No, it's to be trimmed off. And in fact, the amount of flash that was on this tire is comparable to what I have here in my hand. And it was only on part of the bead area, not all of it. And what happens is it's not really in the bead fitment area because there's the interference fit that's created by the bead being smaller than the wheel diameter so that that fits down at that bead base and the flash is removed from the bead base. So how then in your experience, I know what Judge Simon said here and the points that you've raised about his conclusions on the lack of reliability of the expert analysis here. How in other cases do you see experts approach the examination or testing of a tire in the face of an alleged defect? In other words, Professor Wuerl did not do it in a reliable way in your view and in Judge Simon's view. What do you see other experts do? Well, either they subjected to some testing, a testing methodology, or they have authoritative treatises that they can rely on to support their opinions that this is something that does in fact cause... And you've seen that in your experience, that's doable in other words? It is doable. I mean, you may join issue with conclusions and what have you, but it's doable? Yeah. And in fact, Mr. Wuerl has done that. Mr. Wuerl in other cases that I have had for this tire company where Mr. Wuerl has been an expert, he has performed testing, he has relied on various authoritative articles as a basis for his opinions. In this case, he has none of that. I mean, he has nothing that he can point to, as Mr. DeRose said, he is the only one who has said that this flash is something that causes beat unseating. He has... Well, because my time is running low, I don't know that I need to repeat all the factors that are in my brief, but suffice to say that he has really satisfied none of them. There is really nothing about this theory that is based on any reliable science whatsoever, other than the fact that Mr. Wuerl has said so. The other similar occurrences that Mr. Wuerl has mentioned, the four cases that he talks about, those are... There's actually only three cases. All of them involve Mr. Wuerl and three other than this one, where he says that the beat unseated. And in each of those cases, it's nothing more than Mr. Wuerl espousing the same opinion here as he did in those cases. He has no other basis for it, other than the fact that he thinks that this beat unseated for the very same reasons. I will also point out that in the Kamak case, which is one that I had and that I tried against Mr. Wuerl in Wisconsin, his theory in that case was that the flash actually pushed against the beat and pushed it over the safety hump. And that opinion was rejected. And so now what he has done, the jury held in favor of Goodyear-Dunlop in that case. And now what he has done in this theory is he specifically admitted to me that that theory is not plausible and he rejects that. Now he tries to tie it to this Ben Chaffer issue, which also lacks any scientific reliability, no testing, no authoritative articles to back it up. It's simply Mr. Wuerl saying so. Quickly, I'll just comment, I guess, that as to Professor Lee, there's any argument as to his opinions in this case I think has been waived. It's not been raised. He certainly is not qualified to testify to any of these beat defect or beat dislodgement issues. The court was correct to grant summary judgment to us on all of these factors. The manufacturing issue is one that we've talked about with the flash. There is no design issue by admission. There is then no warning issue in this particular case. Because if there is no design issue, then there is no foreseeable warning issue. Mr. Botrick, your time has expired. Oh, I'm sorry. I'm running the other way. My apologies to the court. I didn't want to cut you off from a final statement. Well, thank you. I'm good. Thank you very much. Mr. Shelton. Good morning. David Shelton on behalf of Harley-Davidson. May it please the court. We want to make sure the court is clear as to why we're here and why we're not here. This morning we've heard a lot about the tires. We've heard a little bit about the helmets. We haven't heard anything about the Harley-Davidson rim. We haven't heard anything about a tire pressure monitoring system. Our position is that those issues were not raised during the initial brief and they've been waived. Reviewing the reply brief that was most recently filed, the plaintiff goes out of their way, I think, to abandon all of those issues. They say very clearly that they and their expert found the rim to be fine, which they had to based upon the opinions and record below. With respect to the monitoring system, they don't even try to make any argument in their reply that it was defective or unreasonably dangerous. At most, they say it might be an improvement upon the bike, but that has nothing to do with the standard of those issues. That leaves us here with respect to the tire. As you heard this morning, the plaintiff's claim comes down to the fact that they believe this excess rubber was not scraped from the tire before it left the factory. As it's clear from the record, we had nothing to do with that. We had nothing to do with the distribution or the sale of this particular tire. This was a replacement tire that was bought several years after they purchased the used motorcycle from us. Our position is, under these circumstances, there's no basis under Indiana law for liability against Harley-Davidson. The plaintiff has not offered any case, any legal theory that should make your honors look at liability for Harley-Davidson under these circumstances. Just point out along those lines that because this is a manufacturing defect and not a design defect, since it's a claim that the problem is something that should have been taken care of at the factory, that there's no way that Harley-Davidson could be held liable for that when they had no involvement in the process with respect to this specific tire. If the court has no questions of Harley-Davidson, then we'll round our brief and ask the court to affirm summary judgment in favor of Harley-Davidson. Thank you, Mr. Kellner. May it please the court. My name is Gregory J. Tonner. I represent Nanal, Inc., as well as the individual defendants that own or operate or direct the company. Nanal, Inc. is an internet retailer. It sells many items in the motorcycle industry, including leather jackets, motorcycle helmets, and so on. In this particular case, while there was kind of a snafu with the sizing at the beginning, we know that Nanal sold the helmet that was worn by Mrs. Tim, but not Mr. Tim. Mr. Tim returned the helmet, a helmet that was purchased from Nanal. Nanal did not have an extra large size, so it was purchased through another company through MotorcycleCenter.com, which is owned by Helmet Ventures. Helmet Ventures was not named in the original complaint or the first amended complaint. It was named in the second amended complaint, but because it was filed more than two years after the statute of limitations, the second amended complaint leave was not granted to file it. Mr. Tonner, what if any legal significance is there to the product recall? Is that of any legal significance in your view, given the particular claim that's brought here? I think opposing counsel believes that that's the sole basis, that, oh, it was by default. I do not agree with that proposition. In fact, I completely disagree with it. Oftentimes, there are recalls based on a number of items. For example, hamburger meat can be recalled because of listeria or salmonella. It doesn't mean that every package sold in the wide necessarily is suspect, and so obviously the helmet in question needs to be examined. In this particular case, Mr. Tim was not wearing a helmet sold through Nanal, so he does not have a claim against my clients. Only Mrs. Tim did, and what she did is a few weeks after this incident is she purposely discarded her helmet, and therefore we never had an opportunity to inspect it. So we have no idea, and the plaintiff cannot prove that the helmet that Mrs. Tim was wearing at the time of the accident was in fact defective. What was the recall for? What was it? It's my understanding, although the co-defendant, the Teagle defendants, who are no longer defendants in this case, they were the importer and distributor of the helmets from the Chinese company. What they did is the helmets were tested. There were four of them tested. They did not meet the requirements, and therefore there was a voluntary recall. Teagle is the one that undertook this responsibility, and what they did is in 2012 they recalled helmets that were sold in 2012. It's my understanding that the proposed letter that was to be sent to purchasers of the helmets was to be approved by the government, and that letter went out. It did not include the Tims because they purchased... We know though that under that regulatory framework, the NHTSA regulatory framework, that when a product presents a serious risk to motor vehicle safety, that voluntary recalls often happen because a manufacturer doesn't want to wait for a mandated recall for all kinds of The question I have though is more legal, and that is do you know of precedent that holds that the recall itself as an evidentiary matter can establish the defect? I do not, and in fact the parties stipulated that Indiana law would apply to state substantive matters. Under Indiana code section 34-20-1-1, it's a product liability act, that has been interpreted by this court and other district courts as not allowing and not recognizing a negligent recall or even any sort of duty, any post-sale duty. So therefore I'm unaware of any law or precedent as you In this particular case, when we filed a motion for summary judgment, we cited the key case, which is Pilch, which is a Seventh Circuit case interpreting Indiana product liability law. We also submitted the expert testimony of Dr. Harry Smith, and in this particular case, of course the helmet didn't cause the accident, or it's not alleged to have caused it, but again what we're dealing with here is a crash worthiness case, and in order to have a crash worthiness case under Indiana law, you must prove that the helmet was defective, that was not done here, that there is a feasible alternative design, that was not done here, and that the plaintiff, in this case Mrs. Tim, sustained enhanced injuries. There was no testimony as to that. What type of head injuries did she receive? She didn't receive, I believe, Mr. Tim purchased a half helmet, which is the smallest helmet you can purchase, doesn't even cover your ears, versus a three-quarters helmet or a full helmet. He sustained pretty serious injuries with a fracture of his skull near the forehead area. She had concussion type injuries, but again the accident happened, according to eyewitnesses, at about 60 or 65 miles an hour, and according to our expert, no helmet is going to withstand that type of impact. They're not designed to, you know, protect anyone from that type of a severe impact. The district court has determined that there is no basis in a very well and thoughtful separate decision, it was actually the first decision, the first opinion in order, and it cited an 11th circuit case and also found that there was no post-sale duty under Indian law. For these reasons, we would request that the court affirm summary judgment in favor of the Nenal defendants, and we'd also, I guess, reassert our motion to dismiss appeals on jurisdictional grounds, which has been previously fully briefed before this court. Thank you, Mr. Tom. Mr. Shelton. Let's see, now it's Mr. DeRose. Excuse me, your honors. To answer the questions, I want to start with Goodyear Dunlop first. Council said that excess flash is merely cosmetic. Nothing is further from the truth. Goodyear Dunlop themselves say flash is dangerous, and it has to be trimmed off of the tire before the tire leaves, and if they cannot make proper trimming of the tire, the tire is supposed to be repaired. Documents they provided me, about 1% or less than 1% of tires on a manufacturing line, but 1%, all it takes is one tire to get through. The tire that got through on the tin motorcycle was defective. Professor Worley has made that very clear. That tire should never have left the plant. Now, your honor asked, is there any requirement, or is there any kind of testing that can be done? There is testing that is done. Harley Davidson uses that riderless motorcycle being pulled behind a pickup truck because they know this is too dangerous. If you get a blowout on a motorcycle, most experienced drivers don't know what's going to happen, so they don't run that risk. They put ballast on there. Dunlop does the testing for tire de-beating and unseating in a laboratory, and they can produce de-beating and unseating when they get the tire down to speeds of about one or two miles an hour. I asked all the experts, why don't you use real, live people to do it? Oh, that's too dangerous. We don't want to do that. We'd never do any of that, but who do you warn that is dangerous? They don't even warn their own testing experts. The testing experts who we deposed said, we don't know anything about these lawsuits you're talking about. We don't know anything about this de-beating stuff. We don't know why they wanted us to do this particular testing, but we did it because they asked us to do it. They don't warn their own people about what's being reported. They don't warn the general public, and as your honor may remember, I submitted about 12 affidavits from experienced motorcyclists who have been using Harley-Davidson products for years. Many of them had experience with the D402 tire. They said after they found out about this, they will never use a D402 tire again in their lives. Of course, the D402 has now been completely eliminated. We heard from Harley, we don't know why we're here. You're here, gentlemen, because you advertise the D402 as a preferred and recommended tire, a replacement tire for a Harley-Davidson motorcycle. It's prominent in all your literature. People stand in line to collect that yearly sales catalog. You can't get them. They're gone the day they hit the market, and inside there is references to Goodyear Dunlop being their distributor all over the document. Harley-Davidson doesn't warn. They didn't warn about all those lawsuits that I mentioned in my original brief that I found on the internet. People were screaming, they've got to get the D402 off the market. Professor Worley clearly disagrees with counsel. This trim must always be trimmed off these tires, he says. If you can't get it off, get rid of the tire. That tire that he has inspected in the Tim case has the flash still on it. It might not look like much to us, but he says you can't properly seat the tire. You can't keep it seated under that hump and all those little things that were using it. It looks nice on a picture, but in real life when you're driving down the road and you've got your wife behind you, not 50 pounds of fake ballast, but you've got your wife behind you. In all these cases that I'm talking about, the wife was riding behind the husband. It's a very different thing than what Harley-Davidson did. Oh, we can't produce by towing it. We can't produce a 150 pounds worth of ballast or maybe even more on the back for the passenger, which is what has happened in the real life circumstances. If you have questions on that, I'll take them now. Then on the other one, on the now, I wish I could read my notes. Oh, you know, like, oh, the Nolan motorcycle, they're owned by the same people. It's all the same company. They didn't have the helmet that would fit Mr. Tim at the one place. They got it the other place. All these companies are doing, and Mr. Botezaz and the other gentlemen before, they've all said, well, we use the different names because we look for a better deal. We can buy more products. We get better discounts, and we get a little bit more credibility. That's what's going on. These companies are all interchangeable. I had made the motion that I would like to, I forget it, pierce the corporate veil. His honor wasn't impressed with my theory. That's not the first time, and it probably won't be my last, but that's how that went. Finally, counsel says, well, Indiana law doesn't have anything that makes this illegal. Your honor, in this court in the Pilch case, which counsel mentioned, the last line of the Pilch case says, and they're looking at Indiana law when they make this citation, a plaintiff can show that a product was sold in a defective condition unreasonably dangerous to any user or consumer as required to assert claims under the Indiana Products Liability Act, the IPLA, by showing a design defect, a manufacturing defect, or a failure to warn. No warning was given to the Tims that in the government testing, all the penetration tests, the retention tests, the impact tests, these motorcycle helmets fail miserably. All of these tests, both times they were tested, and both times the companies go get them off the road and warn the people, warn the people that these are dangerous and will increase the possibility of injury to them. Your honor, I still got a green light, but I have no more to say. Have you anything to ask? I don't. No, I think not, Mr. DeRose. That's the first time in my life I ever beat a light. Thank you. Thank you, Mr. DeRose. Thanks to all counsel. The case is taken under